Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM REED, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>QUINSTREET, INC., DOUGLAS VALENTI, and GREGORY WONG,<br><br>    Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff William Reed ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding QuinStreet, Inc. ("QuinStreet" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of QuinStreet between February 10, 2016 and April 10, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company is headquartered in this Judicial District.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying Certification, purchased QuinStreet securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7. Defendant QuinStreet is an internet performance marketing and media company that provides customer acquisition services. The Company is incorporated in Delaware and its principal

executive offices are located at 950 Tower Lane, 6th Floor, Foster City, California 94404. QuinStreet's securities are traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "QNST."

8. Defendant Douglas Valenti ("Valenti") has been the Chairman and Chief Executive Officer ("CEO") of QuinStreet throughout the Class Period.

9. Defendant Gregory Wong ("Wong") has been the Chief Financial Officer ("CFO") of QuinStreet throughout the Class Period.

10. Defendants Valenti and Wong are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

15. On February 9, 2016, after market hours, QuinStreet filed a form 10-Q for the second quarter of 2016 ("2Q16 10-Q") with the SEC which provided the Company's financial results and position for the quarter ending December 31, 2015. The 2Q16 10-Q was signed by Defendant Wong. The 2Q16 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Valenti and Wong attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

16. The 2Q16 10-Q included a risk factor regarding fraudulent clicks, stating in relevant part:

> **We could lose clients if we fail to detect click-through or other fraud on advertisements in a manner that is acceptable to our clients.**
>
> We are exposed to the risk of fraudulent clicks or actions on our websites or our third-party publishers' websites, which could lead our clients to become dissatisfied with our campaigns, and in turn, lead to loss of clients and related revenue. Click-through fraud occurs when an individual clicks on an ad displayed on a website, or an automated system is used to create such clicks, with the intent of generating the revenue share payment to the publisher rather than viewing the underlying content. Action fraud occurs when online lead forms are completed with false or fictitious information in an effort to increase a publisher's compensable actions. From time to time, we have experienced fraudulent clicks or actions. We do not charge our clients for fraudulent clicks or actions when they are detected, and such fraudulent activities could negatively affect our profitability or harm our reputation. If fraudulent clicks or actions are not detected, the affected clients may experience a reduced return on their investment in our marketing programs, which could lead the clients to become dissatisfied with our campaigns, and in turn, lead to loss of clients and related revenue. Additionally, we have, from time to time, had to, and in the future may have to, terminate relationships with publishers who we believed to have engaged in fraud. Termination of such relationships entails a loss of revenue associated with the legitimate actions or clicks generated by such publishers.

17. The 2Q16 10-Q discussed QuinStreet's business to generate high-quality results for its clients, stating in relevant part:

> Our financial services client vertical has been challenged by a number of factors over the past several years, including the limited availability of high quality media at acceptable margins caused by changes in search engine algorithms, acquisition of media sources by competitors and increased competition for quality media. These effects may continue to impact our business in the near future. To offset this impact, we have broadened our product set with enhanced click, lead, call and policy products that have enabled better monetization to provide greater access to high quality media sources. Moreover, we have entered into strategic partnerships to increase and diversify our access to quality media and client budgets.

18. On August 19, 2016, QuinStreet filed its annual report on Form 10-K for the year ended June 30, 2016 ("2016 10-K") with the SEC which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Valenti and Wong. The 2016 10-K contained signed SOX certifications by Defendants Valenti and Wong attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19. The 2016 10-K included a risk factor regarding fraudulent clicks, stating in relevant part:

> **We could lose clients if we fail to detect click-through or other fraud on advertisements in a manner that is acceptable to our clients.**
>
> We are exposed to the risk of fraudulent clicks or actions on our websites or our third-party publishers' websites, which could lead our clients to become dissatisfied with our campaigns, and in turn, lead to loss of clients and related revenue. Click-through fraud occurs when an individual clicks on an ad displayed on a website, or an automated system is used to create such clicks, with the intent of generating the revenue-share payment to the publisher rather than viewing the underlying content. Action fraud occurs when online lead forms are completed with false or fictitious information in an effort to increase a publisher's compensable actions. From time to time, we have experienced fraudulent clicks or actions. We do not charge our clients for fraudulent clicks or actions when they are detected, and such fraudulent activities could negatively affect our profitability or harm our reputation. If fraudulent clicks or actions are not detected, the affected clients may experience a reduced return on their investment in our

marketing programs, which could lead the clients to become dissatisfied with our campaigns, and in turn, lead to loss of clients and related revenue. Additionally, from time to time, we have had to, and in the future may have to, terminate relationships with publishers whom we believed to have engaged in fraud. Termination of such relationships entails a loss of revenue associated with the legitimate actions or clicks generated by such publishers.

20. The 2016 10-K discussed QuinStreet's business to generate high-quality results for its clients, stating in relevant part:

Our goal is to continue to be one of the largest and most successful performance marketing companies on the Internet, and eventually in other digitized media forms. We believe that we are in the early stages of a very large and long-term market opportunity. Our strategy for pursuing this opportunity includes the following key components:

\*          \*          \*

- ***build, buy and partner with vertical content websites that provide the most relevant and highest quality visitor experiences in the client and media verticals we serve***;

\*          \*          \*

We compete both for clients and for limited high-quality media

\*          \*          \*

Our financial services client vertical has been challenged by a number of factors over the past several years, including the limited availability of high quality media at acceptable margins caused by changes in search engine algorithms, acquisition of media sources by competitors and increased competition for quality media. These effects may continue to impact our business in the near future. ***To offset this impact, we have broadened our product set with enhanced click, lead, call and policy products that have enabled better monetization to provide greater access to high quality media sources. Moreover, we have entered into strategic partnerships to increase and diversify our access to quality media and client budgets.***

(Emphasis added).

21. On September 8, 2017, QuinStreet filed its annual report on Form 10-K for the year ended June 30, 2017 ("2017 10-K") with the SEC which provided the Company's annual financial results and position. The 2017 10-K was signed by Defendants Valenti and Wong. The 2017 10-K

contained signed SOX certifications by Defendants Valenti and Wong attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22. The 2017 10-K included a risk factor regarding fraudulent clicks, stating in relevant part:

> ***We could lose clients if we fail to detect click-through or other fraud on advertisements in a manner that is acceptable to our clients.***
>
> We are exposed to the risk of fraudulent clicks or actions on our websites or our third-party publishers' websites, which could lead our clients to become dissatisfied with our campaigns, and in turn, lead to loss of clients and related revenue. Click-through fraud occurs when an individual clicks on an ad displayed on a website, or an automated system is used to create such clicks, with the intent of generating the revenue-share payment to the publisher rather than viewing the underlying content. Action fraud occurs when online lead forms are completed with false or fictitious information in an effort to increase a publisher's compensable actions. From time to time, we have experienced fraudulent clicks or actions. We do not charge our clients for fraudulent clicks or actions when they are detected, and such fraudulent activities could negatively affect our profitability or harm our reputation. If fraudulent clicks or actions are not detected, the affected clients may experience a reduced return on their investment in our marketing programs, which could lead the clients to become dissatisfied with our campaigns, and in turn, lead to loss of clients and related revenue. Additionally, from time to time, we have had to, and in the future may have to, terminate relationships with publishers whom we believed to have engaged in fraud. Termination of such relationships entails a loss of revenue associated with the legitimate actions or clicks generated by such publishers.

23. The 2017 10-K discussed QuinStreet's business to generate high-quality results for its clients, stating in relevant part:

> Our goal is to continue to be one of the largest and most successful performance marketing companies on the Internet, and eventually in other digitized media forms. We believe that we are in the early stages of a very large and long-term market opportunity. Our strategy for pursuing this opportunity includes the following key components:
> - ***focus on generating sustainable revenues by providing measurable value to our clients***;
> - ***build QuinStreet and our industry sustainably by behaving ethically in all we do and by providing quality content*** and website experiences to Internet visitors;

Class Action Complaint for Violation of the Federal Securities Laws

> \* \* \*
> We compete both for clients and for high-quality media.
>
> \* \* \*
> One of the primary challenges of our business is finding or creating media that is high quality and targeted enough to attract prospects for our clients at costs that provide a sound financial outcome for us. In order to grow our business, we must be able to find, develop and retain quality targeted media on a cost-effective basis.

(Emphasis added).

24. QuinStreet's website, under the heading "Redefining Vertical Marketing and Media Online" (https://quinstreet.com/how_we_do_it ), states in relevant part:

> ***We work with you to establish pricing and goals, then create a comprehensive marketing and media program of the highest integrity.***

(Emphasis added).

25. The statements referenced in ¶¶15-24 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) QuinStreet recklessly disregarded the occurrence of click-through fraud; (2) QuinStreet-owned websites experienced phony, low quality traffic for its clients; (3) QuinStreet practices were not geared toward providing its clients with valuable customers or high-quality leads or clicks; and (4) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

26. On April 11, 2018, as the market opened, Kerrisdale Capital published a report entitled "QuinStreet, Inc. (QNST) Leading Nowhere" which discussed QuinStreet's operations (the "Kerrisdale Report"). The Kerrisdale Report discussed QuinStreet's involvement and awareness in generating fake web traffic and poor-quality clicks for its customers, stating in relevant part:

> Unlike, say, insurance.com – a consumer-facing site – Nextinsure.com largely operates behind the scenes. Clicks originating on QuinStreet affiliates' sites or

QuinStreet's own are processed using technology hosted on Nextinsure.com; the traffic then flows outward to advertiser sites, thereby generating revenue for QuinStreet, which in turn pays a portion of that revenue to its affiliates. In an effort to better understand the identity and quality of QuinStreet's affiliates, we examined data from SimilarWeb, a standard resource for analyzing web traffic. According to SimilarWeb, the vast majority of Nextinsure's traffic comes from referrals, i.e. inbound links from other domains.

\* \* \*

But what about Nextinsure's number-one source of traffic – insurancebranch.com? We'd never heard of it before, yet in recent months it appears to have supplied 10% of the inbound traffic to QuinStreet's main network hub. Visiting the site today shows almost nothing – just a background image of the sky, some legal boilerplate linking the site to a marketing firm called Global Wide Media, and the address of an unassuming building in a Los Angeles suburb also associated with two other low-quality sites, smarterlifechoices.com and stayflytravel.com. However, archive.org shows that, as recently as September 29th, Insurance Branch presented itself as a wide-ranging financial-services portal, with links for auto, health, home, life, Medicare, and mortgage but no real content.

\* \* \*

But how did this obscure, strangely named, skeletal site bring so much traffic in to QuinStreet*? Looking again at SimilarWeb data, we find that a baffling 64% of Insurance Branch's traffic is "direct" – i.e. users apparently just typing "insurancebranch.com" into their browsers of their own volition. But of the 28% of traffic that comes from referrals, 67% comes from swagbucks.com – a site that allows consumers to "get free gift cards & cash for the everyday things you do online," including "watch[ing] entertaining videos…answer[ing] surveys and find[ing] great deals."6 Completing these tasks earns users "swagbucks" (SB), usually worth a penny each.*

\* \* \*

Thus, synthesizing the available information, we believe the following has taken place:

• ***Dating back to at least 2016***, whoever created Insurance Branch (perhaps an affiliate of Global Wide Media) effectively paid Swagbucks enthusiasts tens of cents each to enter their ZIP codes and pretend they wanted insurance quotes. Some even managed to get credit for clicking "get quote" multiple times.

• Insurance Branch, as a QuinStreet affiliate, used QuinStreet technology to generate the advertiser-sponsored links for the Swagbucks fans to click on.

- 9 -

Class Action Complaint for Violation of the Federal Securities Laws

- *Each click cost the underlying advertisers money (on the order of dollars or tens of dollars per click) and generated revenue for QuinStreet,* the majority of which it likely remitted back to Insurance Branch.
- *This arrangement grew so large that it came to be the single biggest source of traffic for the Nextinsure.com hub, accounting for 10% of the total.*
- Very recently, parts of Insurance Branch have been deactivated. Perhaps someone finally noticed what was going on.

*Of course, what insurers and other advertisers want is consumers actually shopping for insurance – not opportunists looking to score a few swagbucks.*

\*     \*     \*

In addition to Insurance Branch, we uncovered other suspicious sources of QuinStreet traffic:

- autoinsurance.insure.com: *This site is the second-largest source of recent Nextinsure.com traffic and, as mentioned above, a QuinStreet-owned site. SimilarWeb data indicates that almost all referral traffic into this domain (99%) come from three places: rnddmn.com, rcdnew.com, and newdmn.com. None of these sites has any visible content. A March Reddit post suggests that these domains seem to be generating anomalous traffic elsewhere, and numerous sites focused on malware and adware describe how these domain names are used by malicious programs that produce unwanted pop-up ads and browser redirection:*[7]

> The Newdmn.com is an annoying page which will directly lead you to a variety of advertising pages. … Aside from causing redirects, the 'ad supported' software also can show lots of popup advertisements, slow down the machine and continually gather privacy info about you. … It's made with the sole purpose to show dozens of advertisements … For each click on a link, the creators of the adware receive income.

- guidetolenders.com: *owned by QuinStreet, this site is one of the main components of the company's small mortgage vertical. Its fourth-largest source of referral links is kptrk.us. Entering that address yields a "404 Not Found" error message. The domain is registered to someone in the Chinese city of Zhuzhou named Bai Guicai, who has also registered the defunct site sohorich.com.*

- low-income-car-insurance.com: owned by All Web Leads but, pursuant to that company's partnership with QuinStreet, partially monetized via the Nextinsure.com hub. Despite the site's obvious US focus (e.g. other countries

don't have ZIP codes), SimilarWeb indicates that 36% of its recent traffic has come from Brazil.

• USInsuranceOnline.com: a relatively high-traffic All Web Leads site, again monetized via QuinStreet and Nextinsure. The fourth and fifth largest sources of referrals to the site are amarktflow.com and poll.surveyvoicesresearch.com. The former site hosts no content but is associated with misleading mobile pop-ups, as described on reportscam.com:

\* \* \*

***Thus, across QuinStreet affiliates like Insurance Branch and US InsuranceOnline as well as QuinStreet-owned sites like Guide to Lenders and Insure.com, we find evidence of phony, low quality, and suspicious traffic.***

\* \* \*

***How much can advertisers trust QuinStreet's quality control when real customers are mixed in with Swagbucks seekers and people falling prey to malware pop-up ads?***

\* \* \*

***It's no wonder, then, that a recurrent theme in our conversations with former QuinStreet employees was distaste for the way the company does business. One said that QuinStreet "does a lot of stuff that I think is kind of borderline unethical for clients," including knowingly selling them bad leads or turning a blind eye to questionable affiliates, and described the company as operating "in the gray area of the internet."*** Another narrated the evolution of his perception of the company as follows:

> *At one point, before I went there, the only way I knew QuinStreet is that they said, "Oh, they're really high-quality leads. They don't generate a lot of volume, but what they do is good quality." And that was my opinion before going there. But then when going there, just like every other company, you see that they're not too different from everybody else. Everyone's drinking from the same river, so, you know, we're all getting the same – we're all working off of the same Internet, with the same customers, responding to the same SEO, SEM, and the same click traffic. So it's really not too different from anybody else out there, to kind of tell you the truth. …*

A third former employee said that he left the company because he "wanted to get out of lead generation. ***It's just not the cleanest style of online marketing.***

Class Action Complaint for Violation of the Federal Securities Laws

> *You end up dealing with a lot of shady people. … It's just kind of a shady industry."* **With this "shadiness" borne out in our analysis of the public traffic data, we struggle to reconcile QuinStreet's current valuation with its dubious long-term franchise value.**

(Emphasis added).

27. On this news, shares of QuinStreet fell $2.18 per share, or over 17.6%, from its previous closing price to close at $10.14 per share on April 11, 2018, damaging investors.

28. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of QuinStreet during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, QuinStreet securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

32. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

33. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of QuinStreet securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

35. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- QuinStreet securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold QuinStreet securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

36. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

37. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

38. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

39. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

40. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

41. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of QuinStreet securities during the Class Period.

42. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

43. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in

the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

44. As a result of the foregoing, the market price of QuinStreet securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of QuinStreet securities during the Class Period in purchasing QuinStreet securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

45. Had Plaintiff and the other members of the Class been aware that the market price of QuinStreet securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased QuinStreet securities at the artificially inflated prices that they did, or at all.

46. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

47. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of QuinStreet securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants**

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

50. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

51. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of QuinStreet securities.

52. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

53. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: April 27, 2018                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

Class Action Complaint for Violation of the Federal Securities Laws